UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES ROLLER WORKS, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 3:16-cv-2827 |
| | ) | Judge Aleta A. Trauger |
| STATE AUTO PROPERTY & CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM

State Auto Property & Casualty Insurance Company ("State Auto") has filed a Motion to Dismiss Punitive Damage Claim (Docket No. 29), to which United States Roller Works, Inc., ("U.S. Roller") has filed a Response (Docket No. 31), and State Auto has filed a Reply (Docket No. 33). State Auto has also filed a Motion for Partial Summary Judgment (Docket No. 36), to which U.S. Roller has filed a Response (Docket No. 42), and State Auto has filed a Reply (Docket No. 44), to which U.S. Roller has file a Sur-Reply (Docket No. 50). For the reasons set out herein, both motions will be denied.

## I. BACKGROUND AND PROCEDURAL HISTORY

U.S. Roller is a Tennessee-based company specializing in the application of rubber to steel rollers used in various manufacturing processes. (Docket No. 45 ¶¶ 1–2.) It leases a building located at 1901 Elm Hill Pike in Nashville, on which U.S. Roller, at the times relevant to this case, maintained an insurance policy with Ohio-based State Auto. (Docket No. 1 ¶ 2; Docket No. 42-1 ¶¶ 1–2; Docket No. 45 ¶ 3.) U.S. Roller characterizes the insurance policy as "all-risks," meaning that it covered all risks of physical loss or damage other than those expressly

excluded. (Docket No. 45 ¶ 18.) The policy has a coverage limit of $2,433,600, with an additional $50,000 available in certain situations. (*Id.* ¶ 19.)

The roof of the Elm Hill Pike building consists of metal decking and fiberboard insulation over what is called a "built-up asphalt roof"—or "BUR"—system. (*Id.* ¶¶ 10, 12.) As part of its underwriting process, State Auto sent an agent, Mark Holley, to inspect the building, including the roof, on February 4, 2014. (*Id.* ¶ 25.) In Holley's March 5, 2014 written report of the inspection, under the heading "Roofs," he wrote: "Metal deck, steel bar joist, membrane roof covering—contact uncertain as to age of roof material, no recent replacement—no evidence of leakage." (*Id.* ¶ 30.) Elsewhere in the report, Holley wrote that he had noted "no obvious building maintenance related deficiencies." (*Id.* ¶ 31.) U.S. Roller employees have testified that, prior to the events giving rise to the insurance claim at issue in this case, the building's roof, to their knowledge, was not damaged and did not leak in significant amounts. (*Id.* ¶ 32; Docket No. 42-3 at 12, 15–16; Docket No. 42-4 at 13, 26, 75; Docket No. 42-5 at 11–15.)

On July 28, 2015, a storm hit the Elm Hill Pike building. (Docket No. 42-1 ¶ 3.) At the time of the storm, U.S. Roller's manufacturing crew had already left for the day, but U.S. Roller founder Jim Robers was still on the premises. (Docket No. 45 ¶¶ 40–41.) Robers describes hearing extremely high wind and loud rain. At some point, Robers began to hear water beating on the floor within the building. He followed the noise to the building's production area, where he found "heavy torrents of water" coming into the building and observed gaps in the roof. An external view of the roof confirmed significant damage. (*Id.* ¶¶ 41–45; Docket No. 42-3 at 20, 22, 24.)

U.S. Roller reported the damage to State Auto. In the meantime, U.S. Roller sought to mitigate the immediate effects of the damage by hiring Don Kennedy Roofing ("DKR") to

2

perform temporary repairs. (Docket No. 45 ¶ 47.) U.S. Roller's Vice President of Manufacturing, Richard Howell, testified at his deposition that, despite the temporary repairs, the roofing system continued to observably leak during most rain events. (*Id.* ¶ 50; Docket No. 42-5 at 28.)

State Auto sent a claim representative, Melissa Smith, to inspect the property. (Docket No. 42-1 ¶ 5.) U.S. Roller informed Smith of the damage its employees had observed, including that substantial amounts of water had penetrated the building.[1] (Docket No. 45 ¶ 52; Docket No. 42-2, Ex. 21 at 17.) State Auto does not dispute that, although she had been told that water had poured into the building, Smith made no effort to determine whether the roofing system itself had been infiltrated by water. (Docket No. 45 ¶ 55.) After the inspection, Smith—for reasons that are disputed by the parties—brought in an outside company, Donan Engineering, to further inspect and assess the roof. (Docket No. 42-1 ¶ 6.)

On August 12, 2015, Donan Engineering's Jeff Bradley inspected the roof and confirmed that a portion of it had sustained wind damage. (*Id.* ¶ 7.) Bradley also identified ridges, cracks, and age-related deterioration that, he claimed, were not a result of the storm. (Docket No. 45 ¶ 59.) U.S. Roller takes issue with several aspects of Bradley's methodology, including that he did not perform tests necessary to assess the water intrusion into the roofing system, did not speak to anyone, namely Jim Robers, who witnessed the damage during the storm, and did not consult State Auto's own earlier underwriting report that had found no preexisting deficiencies in the roof. (*Id.* ¶¶ 60–62.) State Auto hired Grecco Construction Consultants ("GCC") to prepare a repair estimate based on the scope of storm-related damage determined by Bradley, and State Auto has paid U.S. Roller $9,562.48 based on the GCC estimate. (Docket No. 42-1 ¶ 8.)

---

[1] State Auto objects to this evidence as based on hearsay. Statements to Smith, however, are admissible as evidence of what information was presented to State Auto's agents, even if not admissible for the truth of the matter asserted. *See United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015). ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." (quoting *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009)).

U.S. Roller, believing that Bradley's initial inspection failed to assess the full extent of the storm damage, maintained that the building required repairs to the entire roof, which would cost substantially more than the limited repairs proposed by GCC. (Docket No. 45 ¶ 67.) In response to U.S. Roller's concerns, State Auto directed Bradley to re-inspect the property on November 5, 2015. According to Bradley, the November 5 inspection did not reveal any storm damage beyond what he had already identified on August 12. (Docket No. 42-1 ¶¶ 9-10.)

On May 20, 2016, counsel for U.S. Roller sent State Auto a letter reiterating U.S. Roller's concerns and stating: "This letter will also serve as formal notice pursuant to [Tenn. Code Ann.] § 56-7-105 of the Insured's intent to make a claim for statutory bad faith if this claim is not fully and promptly paid. As such, please respond accordingly." (Docket No. 42-10, Ex. 41 at 1.) Counsel for U.S. Roller also had the building inspected by its own purported expert, Tom Irmiter of Forensic Building Science, Inc. (Docket No. 42-1 ¶ 11.) Irmiter has taken the position that the entire roof needs to be replaced. (*Id.* ¶ 13.)

State Auto, meanwhile, hired an additional purported expert, Dr. Jonathan Goode of Haag Engineering. Goode inspected the property on August 8, 2016. (*Id.* ¶¶ 14–16.) Goode performed three "core cuts" into the roof, two of which revealed that moisture had, indeed, penetrated the insulation. Nevertheless, Goode endorsed Bradley's conclusion about the extent of the storm damage, based on the assumption that the water infiltration was the result of preexisting leaks. U.S. Roller points out, and State Auto concedes, that Goode made his conclusion without having been aware of, or having reviewed, the earlier underwriting report that found no evidence of preexisting leakage. (Docket No. 45 ¶¶ 76–80.) Based on Bradley's and Goode's assessments, State Auto refused to replace the building's roof or to pay for interior water intrusion. (Docket No. 42-1 ¶ 18.)

4

As part of discovery in this case, a corporate representative of State Auto was asked if his company had any evidence that water had penetrated the roof prior to the storm:

> Q. All right. Do you have any facts or know of any facts to support a claim that the roof was wet—the roof system, the insulation board, the underlayment, things that shouldn't be wet, do you have any facts to support a claim that any of the roofing system was wet and saturated prior to July 28, 2015?
>
> A. No.

(Docket No. 42-10 at 53–54.) U.S. Roller notes that Bradley himself—on whose assessment State Auto's coverage determination was, in large part, based—admitted at his deposition that, if insulation is infiltrated by water, the water will affect its insulating capabilities and shorten the life span of the roof. When asked, during that deposition, whether it was therefore "important to determine the extent of the water intrusion" when "developing a scope of work to accomplish repairs," Bradley responded that it was. (Docket No. 42-8 at 35.) State Auto concedes, for purposes of summary judgment, that infiltration of water has those alleged ill effects on roofing insulation. (Docket No. 45 ¶ 86.)

On November 2, 2016, U.S. Roller filed the Complaint in this case, naming State Auto as the sole defendant and relying on the court's diversity jurisdiction. (Docket No. 1 ¶¶ 2, 4.) Count I of the Complaint alleges breach of contract, based on various actions taken by State Auto related to its performance under the insurance policy, as well as its ultimate failure to pay a sum commensurate with the extent of the storm damage done to the building. In addition to ordinary damages for breach of contract, U.S. Roller seeks punitive damages based on State Auto's intentional, fraudulent, malicious, and/or reckless conduct. (*Id.* ¶¶ 22–29.) Count II is a cause of action for bad faith failure to pay pursuant to Tenn. Code Ann. § 56-7-105, whereby U.S. Roller seeks an additional penalty of 25% of its compensable loss. (Docket No. 1 ¶¶ 30–34.) Altogether,

U.S. Roller seeks up to $850,000 in compensatory damages, punitive damages not to exceed $5,000,000, plus the 25% bad faith penalty. (*Id.* at 7–8.)

On December 28, 2017, State Auto filed a Motion to Dismiss seeking dismissal only of U.S. Roller's claim for punitive damages related to breach of contract, which, State Auto argues, are precluded by the availability of the bad faith penalty. (Docket No. 29.) On February 2, 2018, State Auto filed a Motion for Partial Summary Judgment, arguing that it is entitled to summary judgment in its favor both on the claim for punitive damages under Count I and for the bad faith penalty under Count II. (Docket No. 36.) State Auto has not filed any dispositive motion that would fully resolve the breach of contract claim.

## II. LEGAL STANDARD

### A. Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial

plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

**B. Motion for Summary Judgment**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252 (1986). An

issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Effect of Bad Faith Statute on Punitive Damages for Breach of Insurance Contract

"An insurance policy is a contract . . . ." *Christenberry v. Tipton*, 160 S.W.3d 487, 492 (Tenn. 2005). Accordingly, when a policy holder suffers a covered loss, but the insurer fails to pay, the policy holder has legal recourse in the form of a breach of contract action. *See, e.g., Hood v. Jenkins*, 432 S.W.3d 814, 823 (Tenn. 2013); *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 385 (Tenn. 2009). The Tennessee General Assembly, however, has supplemented a policy holder's common law rights with certain additional statutory protections targeted at specific insurance industry practices. *See, e.g.*, Tenn. Code Ann. § 56-7-109 (requiring prompt payment of covered health insurance claims). Among those additional protections is Tennessee's statute authorizing additional damages for bad faith refusal to pay, Tenn. Code Ann. § 56-7-105. That statute provides:

> The insurance companies of this state, and foreign insurance companies and other persons or corporations doing an insurance or fidelity bonding business in this state, in all cases when a loss occurs and they refuse to pay the loss within sixty (60) days after a demand has been made by the holder of the policy or fidelity bond on which the loss occurred, shall be liable to pay the holder of the policy or fidelity bond, in addition to the loss and interest on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the loss; provided, that it is made to appear to the court or jury trying the case that the refusal to pay the loss was not in good faith, and that the failure to pay inflicted additional expense, loss, or injury including attorney fees upon the holder of the policy or fidelity bond; and provided, further, that the additional liability, within the limit prescribed, shall, in the discretion of the court or jury trying the case, be measured by the additional expense, loss, and injury including attorney fees thus entailed.

Tenn. Code Ann. § 56-7-105(a). To establish a claim under the bad faith statute, a plaintiff must demonstrate "(1) that the insurance policy, by its terms, became due and payable; (2) that a

formal demand for payment was made; (3) that [the insured] waited sixty days after making demand before filing suit; and (4) that [the insurer's] refusal to pay was not in good faith." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007) (citing *Palmer v. Nationwide Mut. Fire Ins. Co.*, 723 S.W.2d 124, 126 (Tenn. Ct. App. 1986)). The insured bears the burden of proving bad faith on the part of the insurer. *Id.*

The General Assembly's decision to create a right to recover statutory damages for bad faith refusal to pay has, as one might expect, raised the question of whether that statute forecloses other, similar avenues of recovery, such as punitive damages for breach of contract. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (explaining that Tennessee permits punitive damages for breach of contract in certain egregious cases). Whether the bad faith statute limits a plaintiff's other grounds for recovery has been wrestled with repeatedly by both Tennessee's state courts and the federal courts that have been asked to construe Tennessee state law. *See, e.g.*, *Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 728 (6th Cir. 2012); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 925 (Tenn. 1998); *Riad v. Erie Ins. Exch.*, 436 S.W.3d 256, 274 (Tenn. Ct. App. 2013); *Berry v. Home Beneficial Life Ins. Co.*, No. C/A 1150, 1988 WL 86489, at *1 (Tenn. Ct. App. Aug. 19, 1988); *Chandler v. Prudential Ins. Co.*, 715 S.W.2d 615, 619 (Tenn. Ct. App. 1986). In *Riad v. Erie Insurance Exchange*, the Tennessee Court of Appeals surveyed this history and the sometimes contradictory conclusions expressed by the courts throughout, concluding finally that the most persuasive reading of the bad faith statute was that the General Assembly had intended merely to create "an additional form of recovery for plaintiffs," not withdraw any preexisting common law avenues for relief. 436 S.W.3d at 274. U.S. Roller urges this court to follow the lead of *Riad* and hold that the bad faith statute does not preclude recovery of punitive damages.

9

Potentially standing in U.S. Roller's way, however, is the Sixth Circuit's published opinion in *Heil Co. v. Evanston Insurance Co.*, in which the court stated, in no uncertain terms, that a policy holder's "breach of contract claim is not a legally sufficient . . . basis for" a punitive damages award because the bad faith statute "provides the exclusive extracontractual remedy for an insurer's bad faith refusal to pay on a policy," and, therefore, "precludes punitive damages." 690 F.3d at 728. As the Western District of Tennessee has observed, *Riad* "created a clear split of authority between the Tennessee Court of Appeals and the Sixth Circuit, with no guidance from the Tennessee Supreme Court." *Northend Inv'rs, LLC v. S. Trust Ins. Co.*, 256 F. Supp. 3d 781, 786–87 (W.D. Tenn. 2017) (citations omitted).

U.S. Roller identifies a number of cases in which district courts have gone with the interpretation in *Riad* over the interpretation in *Heil*. *See Northend*, 256 F. Supp. 3d at 788; *VJ, LLC v. State Auto Prop. & Cas. Ins. Co.*, No. 14-2919, 2016 U.S. Dist. LEXIS 187739, at *33–37 (W.D. Tenn. Aug. 3, 2016); *Lindenberg v. Jackson Nat'l Life Ins. Co.*, No. 2:13-CV-02657-JPM-cgc, 2014 WL 11332306, at *6 (W.D. Tenn. Dec. 9, 2014); *Am. Nat'l Prop. & Cas. Co. v. Stutte*, No. 3:11-CV-219, 2015 WL 1650933, at *3–4 (E.D. Tenn. Apr. 14, 2015); *Pankey v. S. Pioneer Prop.*, No. 1:14-CV-01008JDB-egb, 2014 WL 11514533, at *3 (W.D. Tenn. Aug. 12, 2014). Before this court can consider whether it should join those courts, however, there is a preliminary issue that must be addressed: whether and when this court can depart from an interpretation of state law set forth in a published Sixth Circuit opinion, based only on a ruling of one of the state's intermediate appellate courts.

"When resolving an issue of state law," a federal court must "look to the final decisions of that state's highest court, and if there is no decision directly on point, then [it] must make an

*Erie* guess[2] to determine how that court, if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). Some courts have taken the position that a circuit court's "*Erie* guess" is not a legal precedent in the ordinary sense and, therefore, is not binding on future district courts. *See, e.g., Anderson Living Trust v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 430 n.77 (D.N.M.) ("When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive—interpretive, not normative."). The Sixth Circuit, however, has made clear that, at least as a general proposition, "when a panel of [the circuit court] has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, . . . unless an intervening decision of the state's highest court has resolved the issue." *Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)).

"[T]he district courts in a circuit owe obedience to a decision of the court of appeals in that circuit and ordinarily must follow it until the court of appeals overrules it." *Fernanders v. Daughtrey*, No. 16-10262, 2016 WL 612758, at *4 (E.D. Mich. Feb. 16, 2016) (collecting cases). In cases such as this one, however, that duty to follow precedent comes into conflict with another principle well-settled in this circuit: that "[a] federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

---

[2] "*Erie* guess" refers to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

11

The Sixth Circuit has reckoned with that tension before and has, at least once, concluded that a well-considered intermediate appellate court precedent contradicting the Sixth Circuit's earlier *Erie* guess does indeed permit a court to reconsider what would otherwise be a binding precedent. It is well settled that "a later panel of the [Sixth Circuit] cannot overrule the published decision of a prior panel . . . in the absence of *en banc* review or an intervening opinion on point by the Supreme Court." *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015) (*citing Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). Nevertheless, in *Hampton v. United States*, 191 F.3d 695 (6th Cir. 1999), a panel of the Sixth Circuit did precisely that regarding an issue of Michigan law—based only on new case law from Michigan's intermediate appellate court. *Id.* at 702–03 (citing *Froede v. Holland Ladder & Mfg. Co.*, 523 N.W.2d 849, 852 (1994)).

In *United States v. Driscoll*, 970 F.2d 1472 (6th Cir. 1992), the Sixth Circuit had construed Michigan law to provide that a prospective juror's status as a felon categorically qualified as a basis for dismissal, for cause, from a Michigan jury—a question at issue in federal proceedings because the extent of Michigan's restoration of felons' rights was relevant to the application of the federal 'felon in possession' statute, 18 U.S.C. § 922(g)(1). *Driscoll*, 970 F.2d at 1479. Two years later, the Michigan Court of Appeals, citing *Driscoll*, wrote that it "disagree[d] with this line of federal cases holding that a former felon's civil right to serve as a juror is not restored once that felon is no longer under sentence." *Froede*, 523 N.W.2d at 851. In the first post-*Froede* Sixth Circuit cases on the same issue, the court, in unpublished opinions, continued to follow *Driscoll*. *See United States v. Gilliam*, No. 94–1855, 1996 WL 272392, at *1 (6th Cir. May 20, 1996) (per curiam); *United States v. Reiche*, No. 94–1071, 1995 WL 6242, at *2 (6th Cir. Jan. 5, 1995) (per curiam). When the issue arose again in *Hampton*, however, the

Sixth Circuit panel chose to adopt the rule propounded by the Michigan Court of Appeals in *Froede*, despite there having been no intervening *en banc* Sixth Circuit decision or decision by the Michigan Supreme Court. The court justified its departure from seemingly established precedent on the ground that "this panel may reconsider *Driscoll* because the Michigan courts have expressly indicated, through *Froede*, that they disagree with *Driscoll* and would have decided it differently." *Hampton*, 191 F.3d at 701.

> The *Hampton* court explained:
>
> "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise[.]" Thus, in the absence of any persuasive data that the Michigan Supreme Court would decide that a convicted felon's right to serve on a jury is not restored upon the completion of his sentence, this Court is "not at liberty to depart from the state appellate court's resolution" of this issue of state law.

191 F.3d at 701 (quoting *Hicks v. Feiock*, 485 U.S. 624, 630 n. 3 (1988)).

The *Riad* court devoted a significant amount of attention to the issue of whether the bad faith statute precludes common law recovery over and above the coverage amount provided by an insurance contract. Nothing about the *Riad* decision suggests that its conclusion was cursory or made without a clear eye on the questions at issue. Under *Hampton*, then, *Riad* permits this court to depart from *Heil*.

Having determined that such a course is permissible, this court has little difficulty joining the Eastern and Western Districts in concluding that the bad faith statute does not preclude the recovery of punitive damages. Tennessee courts have historically abided by the principle that "[s]tatutes in derogation of the common law are generally strictly construed," and there is, therefore, a "presumption against the legislature's intention to change existing law." *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999) (citing *Stem v. Nashville*

13

*Interurban Ry.*, 221 S.W. 192, 195 (Tenn. 1920)). Nothing in the bad faith statute makes any suggestion that it derogates the availability of any common law remedy.

Moreover, as the Eastern District observed in *American National Property & Casualty Co. v. Stutte*, the General Assembly, in 2011, enacted a new provision, Tenn. Code Ann. § 56-8-113, that seems to confirm that the bad faith statute does not affect common law remedies. 2015 WL 1650933, at *3; *see* 2011 Tenn. Pub. Acts, ch. 130 (H.B. 1189); *Northend*, 256 F. Supp. 3d at 787–88 (endorsing reasoning of *Stutte*); *Akers v. Allstate Prop. & Cas. Ins. Co.*, No. 2:14-CV-72, 2015 WL 11005023, at *5 (E.D. Tenn. Sept. 28, 2015) (same). The Tennessee Supreme Court had, in *Myint v. Allstate Ins. Co.*, held that the bad faith statute did not preclude recovery under the Tennessee Consumer Protection Act in insurance cases. 970 S.W.2d at 925. The *Myint* court wrote that it found "nothing in . . . the bad faith statute which limits an insured's remedies to those provided therein," and therefore permitted the consumer protection claim to proceed. *Id.* at 925.

The 2011 enactment abrogated *Myint*, but it did so by clarifying that the bad faith statute and other insurance-specific statutes "provide the sole and exclusive *statutory* remedies and sanctions applicable to an insurer, person, or entity . . . for alleged breach of, or for alleged unfair or deceptive acts or practices in connection with, a contract of insurance." Tenn. Code Ann. § 56-8-113 (emphasis added). The revision expressly stated that "[n]othing in this section shall be construed to eliminate or otherwise affect any . . . [r]emedy, cause of action, right to relief or sanction available under common law." *Id. Myint*, then, still states the law of Tennessee with regard to common law remedies.

This court, accordingly, concludes, based on the text of sections 56-7-105 and 56-8-113, the Tennessee Court of Appeals' opinion in *Riad*, and the persuasive analysis of the courts of the

other two districts of this state, that the Tennessee Supreme Court would likely conclude that the bad faith statute does not categorically preclude recovery of punitive damages related to breach of an insurance contract. The court will not grant State Auto's motion to dismiss U.S. Roller's punitive damages claim.

**B. Effect of Tennessee Civil Justice Act on Punitive Damages for Breach of Contract**

State Auto argues next that, even if Tennessee does recognize punitive damages for breach of contract in insurance cases, the amount of those damages should be limited by the Tennessee Civil Justice Act, which provides that, "[i]n a civil action in which punitive damages are sought[,] . . . [p]unitive or exemplary damages shall not exceed an amount equal to the greater of: (A) [t]wo (2) times the total amount of compensatory damages awarded; or (B) [f]ive hundred thousand dollars ($500,000)." Tenn. Code Ann. § 29-39-104(a). U.S. Roller disputes both whether that statute applies and whether it is constitutional but urges the court not to decide either issue now, given that these limits will only come into play if the jury in this case happens to award damages in an amount in excess of the cap. Even where Tennessee's statutory cap on punitive damages applies, the existence of that cap "shall not be disclosed to the jury, but shall be applied by the court to any punitive damages verdict." Tenn. Code Ann. § 29-39-104(a)(6). U.S. Roller is therefore correct that there is no need, at this juncture, to consider the difficult constitutional and statutory issues raised. This court, therefore, will follow the course taken by the Western District in *Carroll v. Nationwide Property & Caualty Co.*, No. 2:14-CV-02902-STA, 2015 WL 3607654, at *6 (W.D. Tenn. June 8, 2015), and decline to address these important, and potentially consequential, issues until such time as doing so may be necessary.

### C. Summary Judgment Regarding Bad Faith

State Auto also argues that it is entitled to summary judgment on U.S. Roller's claim for bad faith refusal to pay, because U.S. Roller cannot establish bad faith. At most, State Auto argues, U.S. Roller can establish that a conflict arose between the opinions of the various witnesses who examined the damage done to the building and that State Auto chose to rely on the opinions more favorable to its position. Such good-faith reliance on expert opinion, State Auto argues, precludes recovery under section 56-7-105. U.S. Roller takes issue with State Auto's characterization and argues that State Auto's actions have borne the mark of bad faith at every stage of the claims process, from its inspections to its weighing of the evidence to its payment determination and communications about the terms of U.S. Roller's policy.

As the court has already observed, in order to recover under the bad faith statute, U.S. Roller must be able to show that (1) the policy of insurance had, by its terms, become due and payable; (2) a formal demand for payment was made; (3) U.S. Roller waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days); and (4) State Auto's refusal to pay was not in good faith. *Stooksbury v. Am.Nat'l Prop. & Cas. Co.*, 126 S.W.3d 505, 519 (Tenn. Ct. App. 2004). State Auto premises its Motion for Partial Summary Judgment only on the fourth element—a lack of good faith. In order to prevail on its motion, then, State Auto must establish that no reasonable jury could look at the facts available and conclude that State Auto's refusal to acknowledge or more thoroughly investigate the extent of the storm damage amounted to bad faith.

Generally, the Tennessee Supreme Court has defined bad faith, in this context, as the failure of an insurance company to "act in good faith and in a diligent manner in its investigation, negotiation, defense, and settlement of claims brought*.*" *State Auto. Ins. Co. of Columbus v.*

*Rowland*, 427 S.W.2d 30, 33 (Tenn. 1968). Under the statute, "the insurer cannot escape liability by considering only what appears to be for its own interest." *Id.* at 34. However, courts have consistently held that, to state a claim for bad faith under Section 56-7-105, a plaintiff must establish more than a mere refusal to pay on a loss. *See, e.g.*, *Lowry v. Nationwide Mut. Fire Ins. Co.*, No. 2:13-cv-159, 2013 WL 4647143, at *3 (E.D. Tenn. Aug. 29, 2013). An insurer's refusal to pay is in good faith, and thus the insurer is not liable under the bad faith statute, if the refusal to pay "rests on legitimate and substantial legal grounds." *Williamson*, 481 F.3d at 378 (quoting *Tyber v. Great Cent. Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978)). Additionally, a delay in payment does not constitute bad faith where "there is a genuine dispute as to value, no conscious indifference to the claim, and no proof that the insurer acted from 'any improper motive.'" *Bard's Apparel Mfg., Inc. v. Bituminous Fire & Marine Ins. Co.*, 849 F.2d 245, 249 (6th Cir. 1988) (quoting *Palmer*, 723 S.W.2d at 126).

State Auto's initial argument as to why U.S. Roller cannot carry its burden is fairly scant. The insurer devotes less than two and one-half pages to the issue in its Brief in Support, most of which is limited to quoting the statute itself and setting forth blackletter law about the elements of the claim and the burden of proof. (Docket No. 37 at 6–8.) The thrust of State Auto's limited argument is that "[t]he proof in the record shows nothing more than a good faith disagreement between the parties and that does not form the legal basis for a bad faith claim." (*Id.* at 8.)

U.S. Roller, however, has alleged significantly more than good faith disagreement between the parties and has identified deposition evidence that supports its theory of the case. At the heart of U.S. Roller's claim of bad faith is the allegation that State Auto repeatedly ignored information and avenues of investigation that would have led it away from its preferred conclusion that the insured building sustained limited damage that could be addressed for a small

fraction of the policy's coverage limit. In particular, State Auto allegedly assumed that certain damage preexisted the storm, despite its own inspection finding no such damage less than a year and one-half before; it ignored or declined to seek relevant evidence regarding both the state of the building pre-storm and during the storm itself; and it relied on limited investigations that were unable to detect potentially significant damage within the roofing structure.

An insurer is, of course, not required to blindly accept the claims of its insured. Moreover, even an erroneous denial by the insurer is not necessarily a sign of bad faith. Whether bad faith was actually present here, however, depends on an assessment of the credibility of the relevant witnesses that this court is not permitted to make on a motion for summary judgment. Based on its assessment of the relative credibility of the witnesses, a reasonable factfinder could conclude that State Auto's cumulative and persistent refusal to acknowledge contrary information or adequately investigate the possibility of greater damage supports an inference of bad faith. State Auto's motion, accordingly, will be denied.

### D. Summary Judgment Regarding Punitive Damages

Finally, State Auto argues that it is entitled to summary judgment on the issue of whether U.S. Roller may be awarded punitive damages for breach of contract. Tennessee law does not permit the assessment of punitive damages for breach of contract "as a general matter," but does permit them "under certain circumstances," namely in "the most egregious cases," in which "there is clear and convincing proof that the defendant has acted either 'intentionally, fraudulently, maliciously, or recklessly.'" *Rogers*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (quoting *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009)). Accordingly, the issues underlying U.S. Roller's punitive damages claim are largely the same as

those underlying its bad faith claim, but the standard that U.S. Roller must meet is more stringent.

Nevertheless, the key issue of credibility similarly precludes summary judgment. U.S. Roller contends—and has proffered evidence that might allow a factfinder to infer—that what State Auto engaged in here was, in essence, a mere simulation of a fair claim assessment process that was, in fact, designed to pay nothing but the most obviously impossible-to-deny aspects of U.S. Roller's claims. A factfinder might also, however, hear the competing testimony and conclude that there was nothing intentional, fraudulent, malicious, or reckless about State Auto's conduct. This determination will be for the jury. State Auto's Motion for Partial Summary Judgment will, therefore, be denied in its entirety.

## IV. CONCLUSION

For the foregoing reasons, State Auto's Motion to Dismiss Punitive Damage Claim (Docket No. 29) and State Auto's Motion for Partial Summary Judgment (Docket No. 36) will be denied.

An appropriate order will enter.

ENTER this 13th day of March 2018.

_____
ALETA A. TRAUGER
United States District Judge